# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SHERRY WEISHEIT, | * |
| Plaintiff | * |
| v. | * |
| | *      CIVIL NO. JKB-17-0823 |
| ROSENBERG & ASSOCIATES, LLC, *et al,* | * |
| Defendants | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

### I. Background

Sherry Weisheit filed this case on her own behalf and on behalf of similarly situated individuals against Rosenberg & Associates, LLC ("Rosenberg"), and Bayview Loan Servicing, LLC ("Bayview"). (Compl., ECF No. 1.) After motions to dismiss were denied (ECF Nos. 29, 30), and a scheduling order was entered (ECF No. 35), the Court granted Weisheit's request for leave to file a second amended complaint (ECF Nos. 57, 58), which is now the operative complaint (hereinafter referred to as the "complaint") (ECF No. 59).

Weisheit has pled three causes of action alleging violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, and the regulations promulgated thereunder, and violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.* She asserts in Count I that Bayview improperly scheduled a foreclosure sale while her loss mitigation application was pending, did not respond within thirty days of her appeal of Bayview's denial of her loan modification application, and did not state in the denial the specific reasons for its decision. In Count II, Weisheit alleges Rosenberg and Bayview violated the FDCPA by scheduling and advertising the foreclosure sale when they were prohibited from doing so, which

also constituted a materially unfair or deceptive practice under the FDCPA. In Count III, Weisheit alleges Bayview failed to acknowledge receipt of a Notice of Error within five days of receipt and failed to correct the errors in the Notice of Error within thirty days of receipt. Her complaint alleges Bayview wrongly denied her a loan modification under the Home Affordable Mortgage Program ("HAMP"). (2d Am. Compl. ¶ 64.)

Pending before the Court are Bayview's motion for summary judgment (ECF No. 75), Bayview's motion to seal (ECF No. 76), and Weisheit's cross motion for partial summary judgment (ECF No. 97).[1] Briefing has been completed on the motions (ECF Nos. 103, 105), and no hearing is required, Local Rule 105.6 (D. Md. 2018). Bayview's motion for summary judgment will be granted. Its motion to seal will be granted in part and denied in part. And Weisheit's cross motion for summary judgment will be denied.

## II.  Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion

---

[1] Also pending are Bayview's objections (ECF No. 98) to Magistrate Judge Gesner's discovery order of December 7, 2018 (ECF No. 93), and Weisheit's response to Bayview's objections (ECF No. 100). Those will be addressed in a separate order.

for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4). A cross-motion for summary judgment is viewed separately on its own merits. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "When considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Id.* (citation omitted).

### III. *Home Affordable Modification Program*

Reacting to the 2008 economic crisis, Congress enacted the Emergency Economic Stabilization Act for various purposes, including the preservation of home ownership. 12 U.S.C. § 5201. In carrying out the Act's purposes, the Secretary of the Treasury was directed to use the authority of that office "to encourage the servicers of the underlying mortgages, considering net present value to the taxpayer, to take advantage of the HOPE for Homeowners Program under section 1715z-23 of [Title 12] or other available programs to minimize foreclosures." 12 U.S.C. § 5219(a)(1).

The Secretary was also directed to

> revise the supplemental directives and other guidelines for the Home Affordable Modification Program of the Making Home Affordable initiative of the Secretary of the Treasury . . . to require each mortgage servicer participating in such program to provide each borrower under a mortgage whose request for a mortgage

3

> modification under the Program is denied with all borrower-related and mortgage-related input data used in any net present value (NPV) analyses performed in connection with the subject mortgage. Such input data shall be provided to the borrower at the time of such denial.

12 U.S.C. § 5219a(a). Further, in carrying out the Home Affordable Modification Program

("HAMP"), the Secretary was to

> establish and maintain a site on the World Wide Web that provides a calculator for net present value analyses of a mortgage, based on the Secretary's methodology for calculating such value, that mortgagors can use to enter information regarding their own mortgages and that provides a determination after entering such information regarding a mortgage of whether such mortgage would be accepted or rejected for modification under the Program, using such methodology.

12 U.S.C. § 5219a(b)(1).

HAMP was created as part of the Troubled Assets Relief Program but was not itself

codified into law. *Cleveland v. Aurora Loan Servs., LLC*, No. C 11-0773 PJH, 2011 WL 2020565,

at *3 (N.D. Cal. May 24, 2011). Under HAMP, mortgage loan servicers entered into Servicer

Participation Agreements ("SPAs") with the Federal National Mortgage Association ("Fannie

Mae") serving as the financial agent for the United States government; a servicer's obligations

were set forth in the SPA as well as in Treasury Department Program Guidelines. *Id.*

"Before HAMP, there was no standard approach among loan servicers or investors about

how to help homeowners who wanted to keep making payments, but needed mortgage assistance.

By setting standards for what constitutes a sustainable modification across the mortgage industry,

HAMP has helped to make private loan modifications more affordable for homeowners." U.S.

Dep't of the Treasury, Making Home Affordable: Home Affordable Modification Program

(HAMP), https://www.treasury.gov/initiatives/financial-stability/TARP-Programs/housing/mha/

Pages/hamp.aspx (last visited June 18, 2019) ("Making Home Affordable Announcement").

4

In HAMP's original form, a borrower could be eligible for a HAMP modification if various requirements were met, including that the proposed modification was for a mortgage loan that originated before January 1, 2009, and secured the borrower's primary residence, the mortgage loan had not previously received a HAMP modification, and the mortgage payments amounted to more than 31% of the borrower's gross monthly income. *Markle v. HSBC Mortg. Corp. (USA)*, 844 F. Supp. 2d 172, 177 (D. Mass. 2011). A "servicer conducts a Net Present Value test, which assesses whether the expected cash flow from a modified loan would exceed the cash flow from the unmodified loan." *Id. See also* 15 U.S.C. § 1639a(a) (to extent servicer owes investors or others duty to maximize net present value, servicer deemed to satisfy duty by entering into qualified loss mitigation plan based on determination, *inter alia*, that modification would "likely provide an anticipated recovery on the outstanding principal mortgage debt that will exceed the anticipated recovery through foreclosures"). Participating servicers were not required to modify mortgage loans, but only to consider modifications to them. *Escobedo v. Countrywide Home Loans, Inc.*, No. 09cv1557 BTM(BLM), 2009 WL 4981618, at *3 (S.D. Cal. Dec. 15, 2009) (SPA "does not state that Countrywide must modify all mortgages that meet the eligibility requirements").

In 2012, HAMP was expanded to increase the pool of eligible borrowers. Making Home Affordable Announcement. That expansion introduced Tier 2 to HAMP, with the original methodology for determination of net present value ("NPV") becoming Tier 1. MHA Handbook for Servicers of Non-GSE Mortgages, Ch. II: HAMP p. 66 n.3 (version 5.1 May 26, 2016) ("MHA Handbook"), Bayview Mot. Summ. J. Ex. E, ECF No. 75-7. According to the MHA Handbook, a mortgage loan may be eligible for HAMP Tier 2 if it satisfied the threshold HAMP criteria but not the Tier 1 criteria or was considered for but did not receive a Tier 1 modification. *Id.* pp. 66-67.

In HAMP Tier 2, "the borrower's post-modification monthly mortgage payment ratio (also called a debt-to-income ratio or DTI ratio) must be greater than or equal to ten percent and less than or equal to 55 percent (Expanded Acceptable DTI Range)." *Id.* p. 105.

A servicer considering a HAMP modification was required to follow a "waterfall" methodology. *Id.* p. 109. Before undertaking the Tier 1 waterfall, the servicer was required to identify any investor restrictions such as those related to rate reduction, term extension or forbearance, or a cap on the percentage of loans in a securitization that can be modified. *Id.*

> For loans that satisfy the eligibility requirements . . . [for HAMP, generally] and . . . for HAMP Tier 1 . . . , servicers must apply the modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent . . . . If the servicer cannot reduce the borrower's monthly mortgage payment ratio to the target of 31 percent, the modification will not satisfy HAMP Tier 1 requirements and the servicer must evaluate the borrower for HAMP Tier 2.

*Id.* The four basic waterfall steps under both Tier 1 and Tier 2 are determination of capitalized unpaid principal balance, interest rate adjustment, term extension, and principal forbearance, but the respective Tier 1 and Tier 2 calculations are not based on identical values. *Id.* pp. 109-12.

Bayview has provided evidence that a servicer receiving a complete loss mitigation application would use the online Treasury Department HAMP Portal to determine whether modification should occur by submitting "the raw data—such as borrower's monthly gross income, borrower's total monthly obligations, escrow advances, taxes, and insurance" to the Portal. (Flick Aff. ¶¶ 18, 19, Bayview's Mot. Summ. J., ECF No. 75-2.) In turn, the Portal "successively reduced the interest rate, extended the loan term, determined a principal forbearance, and forgave principal in a two-tier evaluation for a HAMP loan modification." (*Id.* ¶ 19.) Finally, "[a]fter fully applying the HAMP loan modification waterfall and considering any identified

investor restrictions, the Treasury Portal sent the loan servicer a single HAMP eligibility determination and NPV chart values." (¶ 22.)

## IV. Evidence

On April 26, 2007, Weisheit executed a promissory note to repay $417,000 in principal plus interest for the purpose of financing her thirty-year mortgage loan on her home in Darlington, Maryland. (Promissory Note, Bayview's Mot. Summ. J. Ex. J, ECF No. 75-12.) A security instrument—referenced as "a Mortgage, Deed of Trust, or Security Deed"—was incorporated into the promissory note. (*Id.* ¶ 10.) The monthly payment was in the amount of $2,601.54, and Weisheit's first payment was due June 1, 2007. (*Id.* ¶ 3.) The last payment received from Weisheit was on October 1, 2009. (Foreclosure Notice, Bayview's Mot. Summ. J. Ex. K, ECF No. 75-13.)

On December 27, 2012, Bayview sent Weisheit a letter inviting her to apply for a loan modification and supplying her with information and forms needed to submit an application. (Letter, Dec. 27, 2012, Bayview's Mot. Summ. J. Ex. L, ECF No. 75-14.) Similar letters were sent to Weisheit on April 2, 2013; September 5, 2013; May 12, 2014; August 6, 2014; May 12, 2015; July 22, 2015; and August 6, 2015. (*Id.*) Nothing in the record indicates Weisheit responded to these letters.

On September 14, 2015, Bayview sent Weisheit a letter formally notifying her she was in default and that Bayview, on behalf of the Note Holder, intended to initiate foreclosure action on the mortgaged property. (Foreclosure Notice.) The letter stated the foreclosure would be conducted in the name of "THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE (CWALT 2007-18CB)." (*Id.*) The letter indicated all payments from November 1, 2009, forward were in default; the total monthly payments overdue were $216,900.02 and additional charges of $4,162.56 for late fees and $511.00 for a "corporate advance balance"

7

were assessed, bringing the unpaid total Weisheit owed on that date to $221,573.58. (*Id.*) The principal balance remaining on the loan was $404,925.11. (*Id.*) Weisheit was given fourteen days to cure the default; after that time, Bayview told her "the lender intends to exercise its rights to accelerate the mortgage debt and instruct its attorneys to start legal action to foreclose upon your mortgaged property." (*Id.*)

On September 28, 2015, attorney Gerard Uehlinger wrote Bayview, indicating Weisheit had retained him to represent her regarding the loan and requesting "[a] copy of the [promissory] note, [a] copy of the security instrument with assignments establishing the right to foreclose, [a] copy of the payment history since the loan was last less than 60 days past due, and [t]he name of the investor that holds the loan." (Letter, Sept. 28, 2015, Bayview's Mot. Summ. J. Ex. M, ECF No. 75-15.) The letter was received by Bayview on October 5, 2015. (*Id.*)

On October 8, 2015, Bayview wrote Uehlinger[2] to say it expected to resolve his inquiry by November 3, 2015. (Letter, Oct. 8, 2015, Bayview's Mot. Summ. J. Ex. N, ECF No. 75-16.) On October 16, 2015, Bayview wrote Uehlinger, providing the information that the name of the investor holding the loan is "THE BANK OF NEW YORK MELLON TRUSTEE" and the address of the investor was "101 BARCLAY STREET 8W, NEW YORK, NY 10286." (*Id.*) The letter indicated it included enclosures of "a copy of the payment history, copy of Note, and copy of Deed of Trust pertaining to the account per your request." (*Id.*)

On December 21, 2015, Bayview wrote Weisheit in care of Uehlinger at his office address and titled the letter as "NOTICE OF DEFAULT AND INTENT TO ACCELERATE." (Letter, Dec. 21, 2015, Bayview's Mot. Summ. J. Ex. O, ECF No. 75-17.) By that time, the total amount to cure the default had risen to $231,221.48. (*Id.*) The letter stated it was a formal demand to pay

---

[2] Bayview misspelled Uehlinger's name in its correspondence as "Urhlinger," but used the same address shown on Uehlinger's letter to Bayview.

the sum owed and further stated, "If the default, together with additional payments that subsequently become due, is not cured by 01/25/2016, BLS [Bayview Loan Servicing] will take steps to terminate your ownership in the property by a foreclosure proceeding or other action to seize the property." (*Id.*) Then, the letter said,

> IF YOU ARE UNABLE TO BRING YOUR ACCOUNT CURRENT, BLS offers consumer assistance programs designed to help resolve delinquencies and avoid FORECLOSURE. These services are provided without cost to our customers. You may be eligible for a loan workout plan or other similar alternative. If you would like to learn more about these programs, you may contact the Loss Mitigation Department at 1-877-205-9958, 9:00 a.m. - 6:00 p.m., Monday - Friday, Eastern Standard Time. WE ARE VERY INTERESTED IN ASSISTING YOU.
>
> . . .
>
> If you are experiencing financial difficulty, you should know that there are several options available to you that may help you keep your home. You may contact a government approved housing counseling agency which provides free or low-cost housing counseling. You should consider contacting one of these agencies immediately. These agencies specialize in helping homeowners who are facing financial difficulty. Housing counselors can help you assess your financial condition and work with us to explore the possibility of modifying your loan, establishing an easier payment plan for you, or even working out a period of loan forbearance. For your benefit and assistance, there are government approved homeownership counseling agencies designed to help homeowners avoid losing their homes. To obtain a list of approved counseling agencies, please call 1-800-569-4287 or visit http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm.
>
> You may be eligible for assistance from the Homeownership Preservation Foundation or other foreclosure counseling agency. You may call the following toll-free number to request assistance from the Homeownership Preservation Foundation: 1-888-995-HOPE(4673). If you wish, you may also contact us directly at 1-800-771-0299 and ask to discuss possible options. This matter is very important.
>
> Please give it your immediate attention.

(*Id.*)

On April 26, 2016, the Substitute Trustees filed suit in Harford County Circuit Court against Weisheit, seeking foreclosure on her Darlington, Maryland, property. Docket, Case

No. 12-C-16-001195 (http://casesearch.courts.state.md.us). An affidavit of service was filed May 4, 2016. (*Id.*) Another affidavit of service was filed May 20, 2016. (*Id.*) An affidavit of "Final Loss Mitigation Analysis" was filed June 14, 2016. (*Id.*)

On June 15, 2016, Charlotte HegePfister at Bayview wrote Weisheit and introduced herself as Weisheit's dedicated point of contact to help with her loan. (Letter, June 15, 2016, Bayview's Mot. Summ. J. Ex. P, ECF No. 75-18.[3]) The letter provided information to Weisheit on ways to find solutions to customers' "challenges affording their mortgage payments." (*Id.*) An attachment to the letter also indicated four potential options to avoid foreclosure: a repayment plan, a short sale, loan modifications, and deed-in-lieu of foreclosure. (*Id.*)

Weisheit filed a request for foreclosure mediation on June 30, 2016. Docket, Case No. 12-C-16-001195. The foreclosure mediation, in September 2016, was apparently unsuccessful.

A "Making Home Affordable Program Request for Modification and Affidavit" was completed by Weisheit on September 2, 2016, and received by Bayview on September 8, 2016. (Loan Modif. App'n, Bayview's Mot. Summ. J. Ex. Q, ECF No. 75-19.) Weisheit indicated her monthly gross wages were $715 and her other monthly income was $1,888.49, totaling $2,605.49 in monthly income. (*Id.*) Monthly debts totaled $3,742.46, including a first mortgage payment of $1,840; she indicated she had total assets of $425. (*Id.*) Preceding Weisheit's signature on the application was the following language:

> I understand and consent to the . . . terms of any Making Home Affordable
> Agreement by Servicer to (a) the U.S. Department of the Treasury, (b) Fannie Mae
> and Freddie Mac in connection with their responsibilities under the Homeowner
> Affordability and Stability Plan, [and] (c) any investor, insurer, guarantor or
> servicer that owns, insures, guarantees or services my first lien or subordinate lien
> (if applicable) mortgage loan(s) . . . .

---

[3] The initial letter truncated Ms. HegePfister's name to "Pfi." This was corrected in the September 13, 2016, letter. (ECF No. 75-20.)

(*Id.*)

By letter dated September 13, 2016, Bayview acknowledged receipt of her application but listed certain documents as missing and indicated they needed to be supplied by October 13, 2016. (Letter, Sept. 13, 2016, Bayview's Mot. Summ. J. Ex. R, ECF No. 75-20.) On September 30, 2016, the Harford County Circuit Court granted a consent motion to enlarge the time for Weisheit to file a motion to stay and/or dismiss foreclosure. Docket, Case No. 12-C-16-001195. (The Docket does not indicate how much time was granted for the enlargement.) On October 20, 2016, Bayview sent a letter to Weisheit indicating it had determined she did not qualify for a HAMP Modification because she had not provided all of the documents requested in the September 13, 2016, letter; regardless, Bayview said it was willing to consider any further documentation she might submit. (Letter, Oct. 20, 2016, Bayview's Mot. Summ. J. Ex. S, ECF No. 75-21.) On November 1, 2016, Bayview wrote Weisheit and said it had received a complete loss mitigation application and further indicated the review could take up to thirty days. (Letter, Nov. 1, 2016, Bayview's Mot. Summ. J. Ex. T, ECF No. 75-22.)

Bayview submitted Weisheit's raw data to the Treasury HAMP Portal, which used the data to determine Weisheit was not eligible for HAMP loan modification because her DTI ratio was not in the required range of 10% to 55%. (Printout from Treasury HAMP Portal (https://www.hmpadmin.com/portal/schemas), Nov. 3, 2016, Bayview's Mot. Summ. J. Ex. F, ECF No. 82; Portal Results, Bayview's Mot. Summ. J. Ex. H, ECF No. 83.) The Portal Results showed under the value of "Tier2 PRA – NPV Test" the result, "Ineligible – DTI." (*Id.*) No other reasons for rejecting the requested HAMP loan modification were supplied by the Treasury HAMP Portal to Bayview.

On November 15, 2016, Bayview wrote Weisheit and told her she did not qualify for a HAMP Modification for the following reason:

**Post Mod DTI Outside Acceptable Range:** We are unable to offer you a HAMP Modification because in performing our underwriting of a potential modification, we determined that the proposed modified monthly payment which we could offer you, which includes a modified monthly principal and interest payment on your first lien mortgage loan plus property taxes, hazard insurance premiums, and homeowner's dues (if any) was outside the required range of 10% - 55% of your monthly gross income (your income before taxes and other deductions which we verified as $2,394.95). Your modified monthly housing expense must be equal to or greater than 10% and equal to and [*sic*] less than 55% of your gross monthly income in order for you to be eligible for HAMP. If you believe the verified income we have is incorrect, please contact us at the number provided below.

(HAMP Denial Letter at p. 1, Nov. 15, 2016, Bayview's Mot. Summ. J. Ex. U, ECF No. 75-23.)

This letter also provided the NPV input data fields and values for those data fields. (*Id.* pp. 2-6.) It indicated Weisheit's monthly gross income was determined to be $2,394.95, the property value was $375,000, and the next adjustable rate mortgage reset rate was 6.375% effective December 1, 2016. (*Id.* p. 4.) The number of payments remaining on Weisheit's loan was 246, and the principal and interest payment before modification was $2,601.54. (*Id.*) The NPV also showed monthly real estate taxes were $275.16, monthly hazard and flood insurance was $168.11, and monthly homeowners association dues/fees were $39.41. (*Id.* pp. 4-5.) The capitalized unpaid principal balance, a figure that included all outstanding principal, accrued interest, and escrow advances, was $617,233.52. (*Id.* p. 5.)

The letter also provided values relevant to both Tier 1 and Tier 2 of HAMP Modification. For Tier 1, the capitalized unpaid principal balance, after subtracting principal that the investor would have had to forbear ($531,456.60), was $85,776.92.[4] (*Id.*) The proposed interest rate for a

---

[4] The amount of forbearance, $531,456.60, would not have been forgiven. Weisheit would still have owed this amount, but she would not have been charged interest on it and no payments would have been due on it until she paid off her loan. (*Id.* p. 5.)

Tier 1 modification was 2%, the amortization term of a Tier 1 modification was 480 months, and principal and interest payment for a Tier 1 modification was $259.75. (*Id.*) With regard to a proposed Tier 2 modification, the capitalized unpaid principal balance after forbearance of $165,170.06 was $432,063.46, the interest rate was 3%, and the amortization term would have been 480 months. (*Id.* p. 6.) By separate letter, also dated November 15, 2016, Bayview notified Weisheit that it could not offer her a Bayview Loan Servicing loan modification for the same reason as the denial of the HAMP Modification: the monthly payment would have been outside the DTI range of 10-55%. (Letter, Nov. 15, 2016, Bayview's Mot. Summ. J. Ex. V, ECF No. 75-24.)

On November 29, 2016, attorney F. Peter Silva II wrote Bayview indicating he and his firm represented Weisheit; he captioned his letter as an "APPEAL OF HAMP MODIFICATION DENIAL." (Appeal, Nov. 29, 2016, Bayview's Mot. Summ. J. Ex. W, ECF No. 75-25.) Silva argued that the NPV data allowed a conclusion that the proposed monthly principal and interest payment of $259.75 plus monthly escrow payment of $433.27 totaled $703.02, which fell within the 10 to 55 percent DTI range of $239.50 and $1,317.22, based upon Weisheit's monthly income of $2,394.95. (*Id.*)

On December 29, 2016, Bayview wrote a letter to Silva in response to the Appeal of November 29, 2016. (Appeal Denial, December 29, 2016, Bayview's Mot. Summ. J. Ex. X, ECF No. 75-26.) Bayview noted, "In order to achieve the proposed HAMP [Tier] 1 payment it would have been necessary to extend the term past the Line 21 term of 246 remaining months. The investor has restricted the ability to have the term extended. Therefore, the proposed terms for the HAMP Tier 1 modification of extending to 480 months as indicated within the HAMP Tier 1 waterfall steps could not be met." (*Id.*) The letter also stated, "We have enclosed all supporting

documentation used to complete the review on your account. You are entitled to request additional documentation regarding your inquiry"; the letter then provided a fax number for submitting such a request. (*Id.*)

On January 12, 2017, Silva wrote Bayview and pointed out that the December 29, 2016, letter did not have any documentation enclosed and indicated that someone named Alyssa said Bayview would be faxing those documents within the next 72 hours. (Letter, January 12, 2017, Bayview's Mot. Summ. J. Ex. Y, ECF No. 75-27.) Silva then said,

> A review of the December 29, 2016, letter reveals that Bayview now claims that the reason for the denial is based upon the investor guidelines that it will not extend the term to 480 months. The original reason for the denial was that Ms. Weisheit's DTI was not in the acceptable range of 10-55%. As this purported investor guideline is a new reason for the denial we will be filing an appeal to the denial. However, we will wait to submit this appeal until we have the supporting documents that were supposed to be enclosed with the 12/29/2016 letter that Bayview has stated it will now fax to us within the next 72 hours.

(*Id.*)

On January 27, 2017, Bayview wrote Weisheit in care of attorney Gerard P. Uehlinger (misspelled as "Urhlinger") at his office address and enclosed "a copy of the loan document(s) pertaining to your account per your request." Enclosed with the letter were a copy of the December 29, 2016, Appeal Denial and several pages reflecting internal Bayview tracking of some contacts on Weisheit's loan account. (Letter, January 27, 2017, Bayview's Mot. Summ. J. Ex. AA, ECF No. 75-29.) On January 30, 2017, Bayview attempted to send documents via fax to the number on file for Silva's firm, but an error in transmission occurred. (Fax Error Notice, Jan. 30, 2016, Bayview's Mot. Summ. J. Ex. BB, ECF No. 75-30.)

On February 9, 2017, the law firm of Rosenberg & Associates, LLC, sent a letter to Weisheit at her home address as well as a copy in care of attorney Uehlinger at his office address and a copy to Silva's law firm at that firm's address, notifying Weisheit that "the appointed

Substitute Trustees will sell at public auction the above referenced property on March 9, 2017 at

1:20 p.m.," and enclosed the public advertisement. (Sale Notice, Feb. 9, 2017, Bayview's Mot.

Summ. J. Ex. CC, ECF No. 75-31.)

> On February 15, 2017, a case manager at Bayview sent a letter to Silva's firm saying,
>
> Per your recent communication with Bayview Loan Servicing, it was indicated that
> no attachments were received with the December 29, 2016 response to case #
> [omitted].
>
> · Please accept my apology for the oversight in omitting the verbiage which indicated
> documents used in the inquiry review were attached. This is standard verbiage for
> the response letter when attachments are noted and should have been omitted for
> no attachments were noted in the body of the letter.

(Letter, Feb. 15, 2017, Bayview's Mot. Summ. J. Ex. DD, ECF No. 75-32.)

> On February 28, 2017, Silva wrote a letter to Bayview confirming receipt of the

February 15, 2017, letter. (Letter, Feb. 28, 2017, Bayview's Mot. Summ. J. Ex. EE, ECF

No. 75-33.) In reference to the information in Bayview's December 29, 2016, letter about the

investor's restricting Bayview's ability to extend the term beyond the existing term of 246 months,

Silva said,

> As this purported investor guideline is a new reason for the denial this is a timely
> appeal of the denial for the loan modification. This is a violation of 12 C.F.R.
> § 1024, Supp. I, § 41(d) as Bayview has failed to state specifically what the investor
> requirements are regarding any restrictions to the term. Specifically, does the
> investor limit the term to the existing term or to 360 mos. or some other maximum
> term.
>
> Assuming *arguendo* that the investor will not extend the term to 480 months, using
> the current remaining term of 246 months Ms. Weisheit does qualify for a loan
> modification within the DTI requirements of 10-55% as demonstrated below using
> Bayview's own numbers[.]

(*Id.*) Silva then proceeded to use Tier 1 values for the Tier 2 DTI calculation to argue that Weisheit

qualified for a HAMP modification. (*Id.*) Silva further threatened to sue the Substitute Trustees

and Bayview if Bayview did not cancel the sale by March 3, 2017, claiming that the scheduling of

15

the foreclosure sale for March 9, 2017, was a violation of Weisheit's rights under RESPA and Maryland law. (*Id.*)

On March 6, 2017, Bayview sent a letter to Weisheit in care of attorney Uehlinger at his office address, acknowledging receipt of the inquiry and provided a proposed resolution date of March 30, 2017. (Letter, Mar. 6, 2017, Bayview's Mot. Summ. J. Ex. FF, ECF No. 75-34.) On March 7, 2017, Weisheit filed a request in Harford County Circuit Court for an *ex parte* order, which was granted on March 9, 2016, resulting in the stay of the foreclosure sale until "loss mitigation has been completed and this Court has ruled on Defendant[']s Motion to Stay and/or Dismiss Foreclosure." Docket, Case No. 12-C-16-001195.

In a letter dated April 11, 2017, Bayview wrote Silva and responded to his February 28, 2017, letter insofar as the letter contained "a Notice of Error under 12 C.F.R. § 1024.35, an Information Request under 12 C.F.R. § 1024.36, or which otherwise require[s] a response under state or federal law." (Letter, April 11, 2017, Bayview's Mot. Summ. J. Ex. GG, ECF No. 75-35.) Bayview referred to its November 15, 2016, letter as the "Initial Decline Letter" and the December 29, 2016, letter as the "Appeal Decline Letter." (*Id.*) Bayview disputed Silva's "claims that the Appeal Decline Letter provided a basis for a second appeal," citing 12 C.F.R. § 1024.41(h)(4) for the language that a "servicer's determination under this paragraph is not subject to any further appeal." (*Id.* (emphasis omitted).) Bayview further stated that "the Appeal Decline Letter operated as a final denial of the loan modification review" and concluded that Silva's claim that the subsequent scheduling of the foreclosure sale amounted to dual tracking was without merit. (*Id.*) Bayview also defended its Initial Decline Letter as having provided "ample detail regarding the criteria considered and the basis for the denial." (*Id.*)

## V. Analysis

### A. Bayview's Motion for Summary Judgment

Bayview contends it is entitled to summary judgment on each of the three claims Weisheit has made against it. The Court will consider each count in turn.

#### 1. Count I – RESPA, 12 U.S.C. § 2605(k)(1)(E); 12 C.F.R. § 1024.41(c), (d), (g)

Weisheit's first count depends upon several legal determinations. Weisheit's brief in response to Bayview's motion and in support of her own motion states, incorrectly, that the Court has already decided several legal issues in her favor when it denied Bayview's motion to dismiss. (Weisheit's Opp'n 1, ECF No. 97-1.) Weisheit misunderstands the Court's prior opinion in which the Court was merely giving voice to Weisheit's theories of the case and measuring the strength of her allegations against them. The Court did *not* make rulings as to the legal import of evidence in the case because such would have been improper in ruling upon the only question then before the Court, which was whether the complaint failed to state a claim for relief. Everything said by the Court in that opinion must be construed within that context.

As noted earlier, Count I includes several claims. Weisheit first claims Bayview violated 12 U.S.C. § 2605(k)(1)(E) and 12 C.F.R. § 1024.41(g) by scheduling a foreclosure sale before she had exhausted her loss mitigation appeal rights. (2d Am. Compl. ¶¶ 72, 73.) Under § 2605(k)(1)(E), a loan servicer "shall not fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." Thus, the question in this first claim is whether Bayview failed to comply with an obligation in the regulation at issue. Under § 1024.41(g)(1),

> If a borrower submits a complete loss mitigation application after a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process but more than 37 days before a foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a

foreclosure sale, unless . . . [t]he servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied.

Here, Bayview acknowledged on November 1, 2016, that it had received a complete loss mitigation application from Weisheit. This followed, of course, the first filing on April 26, 2016, in the foreclosure suit. The date of the foreclosure sale had not been scheduled by November 1, 2016, so timewise, Weisheit's application was more than 37 days before the foreclosure sale was scheduled to occur.

Bayview, who is the servicer for Weisheit's mortgage loan, is not a party to the pending foreclosure suit, according to the Harford County Circuit Court Docket. However, the Court assumes for the sake of argument that the references in the regulation to "a servicer" making the first notice or filing for foreclosure and "a servicer" not moving for a court judgment or order of sale or conducting a foreclosure sale are legally equivalent to such actions by the Substitute Trustees, who are the actual plaintiffs in the foreclosure suit, such that Bayview is responsible for the Substitute Trustees' actions. The Court also assumes for the sake of argument that Weisheit's loss mitigation application was still pending when Bayview notified Weisheit that the foreclosure sale was scheduled to take place on March 9, 2017.

Regardless, RESPA imposes liability, through § 2605(f) and (k), only for a servicer's "fail[ure] to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." The regulation in question, § 1024.41(g)(1), lists a servicer's obligations under these circumstances: "[A] servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale . . . ." Given the context, the word "move" undoubtedly refers to the action of

18

making or filing a motion in a court case. The state court docket does not show any motion for foreclosure judgment or order of sale was filed. Further, no evidence is on record that Bayview, or anyone else, actually conducted a foreclosure sale of Weisheit's property. Weisheit argues that the act of scheduling a foreclosure sale is a violation of the regulation; however, the regulation does not prohibit scheduling a foreclosure sale. Weisheit's argument is an attempt to expand the scope of liability beyond the plain wording of the regulation, but § 2605(k) limits liability to failure to comply with an "obligation found by the Bureau of Consumer Financial Protection, *by regulation*, to be appropriate to carry out the consumer protection purposes of this chapter." Scheduling a foreclosure sale is not part of the regulation relied upon by Weisheit. Bayview is entitled to summary judgment on her claim of dual tracking.

Weisheit's next claim within Count I is for a violation of 12 C.F.R. § 1024.41(c)(1)(ii) and (d). Section 1024.41(c)(1)(ii) provides,

> Except as provided in paragraph (c)(4)(ii) of this section, if a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale, then, within 30 days of receiving the complete loss mitigation application, a servicer shall . . . [p]rovide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage. The servicer shall include in this notice the amount of time the borrower has to accept or reject an offer of a loss mitigation program as provided for in paragraph (e) of this section, if applicable, and a notification, if applicable, that the borrower has the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal, as provided for in paragraph (h) of this section.

Section 1024.41(d) states,

> If a borrower's complete loss mitigation application is denied for any trial or permanent loan modification option available to the borrower pursuant to paragraph (c) of this section, a servicer shall state in the notice sent to the borrower pursuant to paragraph (c)(1)(ii) of this section the specific reason or reasons for the servicer's determination for each such trial or permanent loan modification option and, if applicable, that the borrower was not evaluated on other criteria.

Taking the latter section first, Weisheit claims Bayview violated § 1024.41(d) "because it did not state the 'specific reasons' why Plaintiff was denied for each available loan modification option. . . . [T]he servicer must identify the investor and the specific investor requirements at issue. Bayview did not do this." (2d Am. Compl. ¶ 67.) Weisheit's claim on this point depends, initially, upon a determination of whether Tier 1 is a separate and independent loan modification option from Tier 2. This determination is necessary because Weisheit argues she was denied under Tier 1 of the HAMP waterfall for a reason different from the reason she was denied under Tier 2 of the HAMP waterfall and that Bayview was required to state the specific reason she was denied under Tier 1 in its denial letter. (Weisheit's Cross-Mot. & Opp'n Mem. Supp. 13, ECF No. 97-1.)

Neither "loan modification option" nor "loss mitigation option" is defined in RESPA. In the regulations promulgated by the Bureau of Consumer Financial Protection ("Bureau"), the phrase "loss mitigation option" is defined to mean "an alternative to foreclosure offered by the owner or assignee of a mortgage loan that is made available through the servicer to the borrower." 12 C.F.R. § 1024.31. Although Weisheit contends "HAMP Tier 1 and HAMP Tier 2 were two separate 'options' under Section 1024.41" (Weisheit's Cross-Mot. & Opp'n Mem. Supp. 13), her only authority for that proposition is the definition of "option" from Merriam-Webster Dictionary, which she quotes as "'something that may be chosen,' such as 'an alternative course of action'" (id. 14). But the Court's understanding of HAMP is based upon the Treasury Department's announcements and guidelines since it was the agency that created HAMP. And nothing in the materials before the Court indicates that the Treasury Department regarded Tier 1 and Tier 2 as separate and independent loss mitigation options. Moreover, nothing in those materials indicates that a borrower or a loan servicer could elect Tier 1 independently of Tier 2, i.e., that Tier 1 could "be chosen" as an "alternative course of action" to Tier 2, or vice versa. The 2012 expansion of

HAMP eligibility criteria cannot logically be taken as the creation of a new loss mitigation option. That event, in the Court's view, only reinforces the conclusion that HAMP is properly regarded as a single loss mitigation option. Weisheit certainly did not apply for either a Tier 1 modification or a Tier 2 modification; instead, she submitted a single application under the Making Home Affordable initiative and was considered for a HAMP Modification.[5] In turn, Bayview submitted her data to the Treasury HAMP Portal, which analyzed it and returned a single reason for HAMP denial. That was the reason communicated to Weisheit. In that respect, Bayview complied with § 1024.41(d). The fact that the Treasury HAMP Portal returned only one reason for denial further supports the conclusion that HAMP was a single loss mitigation option. Even so, Bayview would not have been remiss in providing a more fulsome explanation of the HAMP Portal calculation; such may well have obviated this lawsuit.

Weisheit additionally claims Bayview violated § 1024.41(c)(1)(ii) because its Appeal Denial Letter constituted an additional denial of her loan modification application but failed to tell her how much time she had to appeal that claimed additional denial and how to accomplish that. (2d Am. Compl. ¶ 60.) The letter in question was not really a new denial; it was simply a reinforcement of the original decision to deny a HAMP Modification. However, because it provided new information about the denial process, it is understandable that Weisheit viewed it differently. But even if it can be viewed as a new denial, no evidence before the Court indicates Weisheit suffered any actual damages from any failure to tell her how much time in which she had to appeal the decision and the process for doing so. Nothing in the record shows Weisheit had any

---

[5] Bayview also considered her for its own proprietary loan modification option, but she did not qualify for that for the same reason she failed to qualify for the HAMP Modification; she did not appeal that denial and she has not made an issue of it in this case. Bayview's consideration of Weisheit's application for the proprietary option was in keeping with § 1024.41(c)(1)(i), which requires a servicer after receipt of a complete loss mitigation application to "[e]valuate the borrower for all loss mitigation options available to the borrower."

realistic way to qualify for a HAMP Modification; consequently, any appeal by her would not have yielded the HAMP Modification she sought and she would have still been subject to foreclosure. At most, she can establish a technical failure of compliance with the regulation. However, without actual damage as a result of that failure, she cannot establish Bayview's liability to her. *See Lage v. Ocwen Loan Servicing, LLC*, 839 F.3d 1003, 1011 (11th Cir. 2016) ("Damages are 'an essential element' of a RESPA claim."). And no evidence can be found that Weisheit suffered actual damage as a result of any technical noncompliance with § 1024.41(c)(1)(ii). *See also Benner v. Wells Fargo Bank, N.A.*, No. 2:16-cv-00467-NT, 2018 WL 1548683, at *9 (D. Me. March 29, 2018) ("Because any damages that would have accrued regardless of a violation cannot have occurred as a result of that violation, RESPA plaintiffs must present specific evidence to establish a causal link between the financing institution's violation and their injuries." (Internal quotation marks omitted).). Bayview is entitled to summary judgment on this portion of Count I.

The Court notes that Count I also claims for Weisheit and the putative class statutory damages based upon an alleged pattern or practice of violating the regulations as set forth in Count I. Because the Court concludes Weisheit has not established liability against Bayview in Count I, no evidentiary basis can be found for claiming those statutory damages.

Finally, in relation to Count I, Weisheit seeks this Court's declaration as to "the rights of the parties concerning when a foreclosure sale may be lawfully scheduled in the State of Maryland." (2d Am. Compl. ¶ 6.) This prayer for relief is noticeably vague and warrants no further consideration. Summary judgment will be granted to Bayview on Count I.

### 2. *Count II – FDCPA*

In Count II, Weisheit alleges, "By scheduling and advertising foreclosure sales of the Plaintiffs' property, . . . when those sales cannot be held in violation of (i) 12 U.S.C.A. § 2605 and

22

12 C.F.R. § 1024.41, and/or (ii) the terms of the deed of trust, Rosenberg and Bayview have materially violated 15 U.S.C.A. § 1692e." (2d Am. Compl. ¶ 81.) She also alleges that "Defendant's [*sic*] actions described herein also constitute materially unfair or deceptive practices in violation of 15 U.S.C.A. § 1692f." (*Id.* ¶ 82.)

Because Weisheit rests the validity of Count II upon the validity of her claims in Count I, and because the Court has concluded the evidence does not support her claims in Count I, the Court likewise concludes that Bayview is entitled to judgment on Count II.

### 3. *Count III – RESPA*

In Count III, Weisheit alleges she sent, on February 28, 2017, "a notice of Bayview's errors in the servicing of her loan including the allegation of dual tracking." (*Id.* ¶ 88.) She alleges "Bayview violated RESPA and 12 C.F.R. 1024.35 by failing to acknowledge receipt of the Notice of Error within 5 days of receipt and by failing to correct the errors within 30 days of receipt." (*Id.* ¶ 91.)

Under 12 U.S.C. § 2605(e)(1)(A), a servicer who "receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan . . . shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period." On March 6, 2017, Bayview sent a notice of acknowledgement of receipt of the February 28, 2017, letter to attorney Uehlinger at his Towson, Maryland, office address. The Court construes § 2605(e)(1) as requiring acknowledgement within five days of receipt. The February 28 letter was sent via first-class mail. It bears a date stamp of March 6, 2017, the same date as the letter of acknowledgement. Given that March 4 and 5, 2017, were a Saturday and a Sunday, respectively, the Court concludes Bayview complied with the five-day requirement of

§ 2605(e)(1)(A). Weisheit has pointed out that the acknowledgement letter was sent to Uehlinger rather than Silva. To the extent Bayview erred in that regard, the Court has found no evidence of actual damage to Weisheit resulting from that misdirection. As to this portion of Count III, Bayview is entitled to summary judgment.

The other contention in Count III is that Bayview failed to correct the asserted errors in the Notice of Error within thirty days of receipt. (*Id.* ¶¶ 91, 92.) Under 12 U.S.C. § 2605(e)(2),

> Not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall—
> (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);
> (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—
> (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and
> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or
> (C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—
> (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

Based on the date stamp of March 6, 2017, on the letter of February 28, 2017, the date of March 6, 2017, is deemed the date of receipt by Bayview. The thirtieth day following March 6, 2017, excluding legal public holidays, Saturdays, and Sundays, was April 17, 2017. On April 11, 2017, Bayview responded with its letter to Silva. Thus, the date of response is timely under

24

§ 2605(e)(2). In the letter, Bayview explained that its December 29, 2016, letter operated as a final denial of Weisheit's loan modification review, and that pursuant to 12 C.F.R. § 1024.41(h)(4), its determination was not subject to any further appeal. Because no further appeal was permissible under the regulation, Bayview disputed Weisheit's "claims that the Appeal Decline Letter provided a basis for a second appeal." (Letter, April 11, 2017, Bayview's Mot. Summ. J. Ex. GG.) Bayview also disputed Weisheit's claims that the subsequent scheduling of a foreclosure sale violated the dual tracking prohibition of § 1024.41(g)(1). Bayview additionally stated that its November 15, 2016, letter provided "ample detail regarding the criteria considered and the basis for the denial." (*Id.*) The letter closed with contact information for an individual at the Blank Rome law firm.

Although the April 11, 2017, letter did not provide the resolution desired by Weisheit, it did fulfill the requirement of § 2605(e)(2) for Bayview to respond to the February 28, 2017, letter. Bayview chose to respond under § 2605(e)(2)(B) by explaining why it believed Weisheit's account was correct. That was all the regulation required of it. Bayview is entitled to summary judgment on this remaining portion of Count III.

### B. *Weisheit's Cross-Motion for Partial Summary Judgment on Liability Against Bayview*

Weisheit's request for summary judgment depends upon no different evidence from that related by the Court in Section IV of this memorandum opinion. The Court has previously considered her arguments as to the legal import of various pieces of evidence and has rejected them. The Court has further concluded that any lack of compliance with certain regulations amounted to, at most, technical noncompliance and that Weisheit has not provided evidence of actual damage resulting from such technical noncompliance. Without actual damage, her cause of action under RESPA fails. Thus, she is not entitled to summary judgment on Counts I and III.

Because Count II under the FDCPA is dependent upon an actionable claim under RESPA, Weisheit is also not entitled to summary judgment on that count.

## VI. *Bayview's Motion to Seal*

Bayview has asked the Court to seal Exhibits A, B, C, D, F, H, and I to Michael Flick's Declaration in Support of Bayview's Motion for Summary Judgment. (ECF No. 76.) Bayview asserts the exhibits contain information designated as confidential pursuant to the March 15, 2018, protective order entered earlier in this case (ECF No. 45). (Bayview's Mot. Seal Mem. Supp. 1, ECF No. 76-1.) It further argues no appropriate alternative to filing the information and documentation under seal exists because of its discussion of confidential business information. (*Id.* 2.) Bayview states the information "is proprietary because the information is not generally known outside of Bayview and relates to Bayview's internal policies and procedures, compliance reviews, and internal information regarding loan account servicing." (*Id.*) Finally, Bayview asserts its "desire to protect its sensitive information outweighs the public's common law right to access judicial documents, thereby justifying sealing the confidential materials at issue in this motion." (*Id.*)

Whether a court document should be sealed requires consideration of the standard set forth in *Va. Dep't of State Police v. Washington Post*, 386 F.3d 567 (4th Cir. 2004). A party's mere desire to keep information confidential does not suffice. Documents submitted to a court to support or oppose a motion for summary judgment can only be sealed if they pass a First Amendment test. *Id.* at 578. Thus, the proponent of sealing such documents must proffer a compelling governmental interest and must show that the proposed sealing is narrowly tailored to serve that interest. *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988), *cited in Va. Dep't of State Police*, 386 F.3d at 578. Further, the party requesting sealing must present specific reasons

in support of its position. *Id.* at 575. In considering a motion to seal, a district court must give the public both notice of the sealing request and a reasonable opportunity to challenge it. *Id.* at 576. In addition, consideration must be given to alternatives less drastic than sealing. *Id.*

The Court notes that no objection has been filed by anyone to Bayview's motion, which is a matter of public record by virtue of its filing in the case docket. That circumstance could be construed as a lack of public interest in the records Bayview asks this Court to seal. Regardless, out of the seven exhibits that Bayview has requested to be sealed, the Court considered only two of them—Exhibits F and H—in this opinion on the merits of the summary judgment motions. The others were not relevant to the Court's disposition. In *Va. Dep't of State Police*, as well as in *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178 (4th Cir. 1988), the Circuit noted the relevance or not of the district's court's consideration of the materials at issue when rendering a decision on the merits and implicitly suggested it could be a factor in making a decision regarding the materials' sealing. *See Washington*, 386 F.3d at 578, 580; *Stone*, 855 F.2d at 182-83. Applying that factor to this case, the Court concludes that Exhibits A, B, C, D, and I should remain sealed since the Court did not consider them in deciding the summary judgment motions.

The Court did, however, consider Exhibits F and H in reaching its decision on whether to grant or deny summary judgment. Exhibit F appears to be information either given to or received from the Treasury HAMP Portal in Bayview's consideration of Weisheit's loan modification application. Frankly, the information is difficult to decipher, and the Court notes that a portion of Exhibit F is already redacted. The Court cannot detect therein what information should be considered proprietary, confidential business information, but Bayview will be given an opportunity to offer redactions that do not impinge upon anything the Court has included in this opinion. As for Exhibit H, with the possible exception of the unredacted account number for

27

Weisheit's loan, the Court finds it consistent with the information Bayview included in its unsealed, unredacted motion for summary judgment. But Bayview will also be given an opportunity to offer redactions as with Exhibit F.

### VII. Conclusion

No genuine dispute of material fact exists with regard to Weisheit's claims against Bayview. As a matter of law, Bayview is entitled to summary judgment on all counts, and Weisheit is not so entitled. Bayview's motion to seal will be granted in part and denied in part. A separate order follows.

DATED this 16 day of July, 2019.

BY THE COURT:

James K. Bredar
Chief Judge